IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ORANGEBURG DIVISION

| | |
|---|---|
| Timothy Lee Wright, | ) |
|            Plaintiff, | ) Civil Action No. 5:18-cv-00029-TMC |
| v. | ) **ORDER** |
| Warden Joseph McFadden,<br>Lieutenant Karl Von Mutius,<br>Lieutenant Joseph Bass, | ) |
|            Defendants. | ) |

Plaintiff, Timothy Lee Wright ("Wright"), proceeding *pro se*, brought this 42 U.S.C. § 1983 action against Defendants, Warden Joseph McFadden ("McFadden"), Lieutenant Karl Von Mutius ("Von Mutius"), and Lieutenant Joseph Bass ("Bass") (collectively "Defendants"), alleging that they violated his constitutional rights. Defendants filed a motion for summary judgment (ECF No. 62), and Wright filed a response in opposition (ECF No. 67).

Pursuant to 28 U.S.C. § 636(b) and District of South Carolina Local Civil Rule 73.02(B)(2), this case was referred to a magistrate judge for all pre-trial proceedings. This matter is now before this court on the magistrate judge's Report and Recommendation ("Report"), recommending that the court grant Defendants' motion for summary judgment.[1] (ECF No. 70). The magistrate judge alerted Wright of his right to file objections to the Report. (ECF No. 70-1). Wright filed timely objections (ECF No. 73), and this case is now ripe for review.

---

[1] The magistrate judge's recommendation has no presumptive weight, and the responsibility for making a final determination remains with the United States District Court. *Mathews v. Weber*, 423 U.S. 261, 270 (1976). The court is charged with making a de novo determination of those portions of the Report to which specific objection is made. The court may accept, reject, or modify, in whole or in part, the recommendation made by the magistrate judge or recommit the matter with instructions. 28 U.S.C. § 636(b)(1).

## I. Facts

This action stems from incidents that occurred on November 1, 2016. Wright alleges that when Defendant Bass came to his cell to deliver lunch, his cell mate, Jonathan Arnold ("Arnold"), went to the food flap and told Defendant Bass that he had not received his insulin shot for that day. (ECF No. 1 at 4). Wright alleges that Defendant Bass stated that he did not have any control over medical and threatened to spray gas on Arnold if he did not move away from the food flap. *Id.* Wright asserts that at that time, he came down from his bunk and told Defendant Bass that two people lived in that cell and that Wright had done nothing to deserve to be gassed. *Id.* According to Wright, Defendant Bass left their cell, and when he came back, he threatened to gas Arnold again. *Id.* Wright alleges that this threat was not preceded by any directives or warnings. *Id.* Following this threat, Defendant Bass allegedly sprayed gas[2] into Wright and Arnold's cell. *Id.* After the first spray, Wright states that he climbed inside of his mattress to take cover and that, after a few minutes, he heard a "long[,] long burst of gas sprayed into his cell." *Id.* at 5. When the long burst was sprayed, Wright says he heard Defendant Von Mutius tell another officer to go get a gun. *Id.* At that time, Wright decided to come out from his mattress and was taken by the officers. *Id.*

Wright alleges that following the spraying, he was not allowed to shower. *Id.* at 5–6. He further states that his room was stripped, and he was left with nothing to clean the gas off the floor, walls, or himself. *Id.* at 5. He contends that his water was turned off due to him being placed on seventy-two hours of "control cell" conditions. *Id.* Wright claims that Warden McFadden gave the order that he and Arnold be placed on control cell. *Id.* at 5–6. As a result of these events, Wright says he suffered burning, pain, and the inability to breath along with mental anguish and psychological trauma. *Id.* at 6.

---
[2] Specifically, he sprayed a chemical munition known as MK-4.

On the other hand, Defendants claim that Bass and Von Mutius only sprayed gas into Wright's cell after Bass was physically assaulted by both Wright and Arnold. (ECF No. 62-1 at 2). Defendants assert that Arnold reached through the food service window of his cell and attempted to grab Defendant Bass by the vest, and that when Bass tried to close the window, Arnold blocked the window with his arm. *Id.* Defendants allege that Wright then approached the window with an unknown substance in his hand. *Id.* Defendants state that it was at that time that Bass sprayed the first burst of chemical munitions through the window, and that despite the spray, Wright was still able to throw the unknown substance on Bass. *Id.* Defendants assert that Bass continued to try to close the window, but Wright and Arnold pushed a broken broom handle through the window, which struck Bass on the hand. *Id.* at 3. In response, Defendant Bass sprayed a second burst of chemical munitions. *Id.* Defendants claim that Officer Cline came to assist Defendant Bass in attempting to secure the window, but they were unsuccessful. *Id.* Wright and Arnold had allegedly pushed various items, including a sheet, into the window so that it could not be closed. *Id.* The officers called for backup, and Defendant Bass began videotaping the incident once backup arrived. *Id.*

Defendants state that Lieutenant Grant then repeatedly directed Arnold and Wright to remove the items from the window. *Id*. at 4. Defendant Von Mutius then warns Wright and Arnold that he is going to give one more directive to remove things from the cell, which he did. *Id*. When Wright and Arnold did not respond, Defendant Von Mutius sprayed a different, more concentrated chemical spray[3] into the cell. *Id.* Defendant Von Mutius then stated that the next step would be to use a thirty-seven millimeter nonlethal weapon. *Id.* At that time, Wright and Arnold complied with the orders and were removed from the cell. *Id.*

---

[3] Specifically a chemical munition known as MK-9.

A registered nurse examined Arnold and Wright and stated that they were not in respiratory distress and were okay to go back to the cell. *Id.* at 4, 12. Arnold and Wright were then strip-searched, and Wright was provided a new jumpsuit. *Id.* at 4. Defendants state that while Arnold and Wright were being searched, their cell was being stripped and cleaned.[4] *Id.* at 4–5. Defendants agree that Wright and Arnold were placed on "control cell" following the incident, but they argue that the water was not turned off in the cell. *Id.* at 5.

As noted in the Report, Defendants have filed two videos depicting some of the events. The first video, Exhibit K-Video 1, is thirty-seven minutes and fifty-five seconds long, and it depicts the following. At the start of the video, an officer can be seen wearing a face shield and gloves and holding the flap on the door closed with his hands. There is some white material that is preventing the flap from closing. No inmates can be seen on the screen. The officer (later identified as Defendant Bass) turns around and speaks to someone behind the camera (later identified as Lieutenant Grant ("Grant")) and says "I can't believe he assaulted me." Grant then asks "Who assaulted you?" Bass answers, "Both of them. . . . I did spray gas in there." Grant then enters the camera frame. Grant yells, "Timothy, why'd you assault this man," to which one of the inmates on the other side of the door yells an unintelligible response. Grant continues to ask Wright why he assaulted the officer, but it is unclear what Wright's answer was to these questions.

Grant asks Bass what happened. Bass says "I tried to feed them. He reached out and grabbed my chest. I tried to close the door, and he caught me with something. And then he had a broom handle; we snatched it out. Then he won't let me close the flap."

Grant and another unidentified officer can be seen holding the flap closed while Grant continues to try to talk with the inmates inside. The officers can be heard coughing throughout

---

[4] As Defendants note, the cleaning of Wright and Arnold's cell is not visible on the video. (ECF No. 62-1 at 5).

the encounter. At three minutes and nineteen seconds into the video, Bass's hand becomes visible on the screen, and it is clearly bleeding.

At three minutes and twenty-seven seconds into the video, Grant orders Wright to "pull that stuff out the flap." Over the span of the next three minutes, Grant makes the same directive ten more times. At seven minutes and sixteen seconds into the video, Grant then asks for help to be sent to the cell.

Over the next seven minutes, Grant tells Wright five more times to remove the material from the flap. At around fourteen minutes into the video, one of the inmates behind the door states that he needs to wash the gas off of him.

At fifteen minutes and eleven seconds into the video, Grant again orders Wright to move the materials from the flap. Wright responds to "stop playing with my legal work." Grant states he is not "playing with nothing" and says he gave Wright "all the official paper work" that he needs to complete. For the next several minutes, Grant and an unidentified officer struggle to hold the flap closed. There is no camera view of who or what the officers are struggling against.

At twenty-three minutes and fifty-eight seconds into the video, Defendant Von Mutius comes on the screen, dressed in a protective vest, helmet, and face mask. He states that inmates Arnold and Wright have assaulted a staff member and have barricaded their window. He states that the officers are going to try to secure the window, and that he is going to give one more directive and then spray MK-9 cellbuster into the cell. Von Mutius coughs multiple times while giving this debriefing.

Von Mutius then walks to the cell and says "Listen. I am going to give you one directive. You need to move the stuff out the window." Approximately three seconds later, Von Mutius then sprays a burst of gas into the cell. The spray lasts for approximately three to four seconds.

After the spraying, officers close the door flap and hold it closed. One of the inmates can be heard saying, "You sprayed a little too much gas." Both the officers and the inmates can be heard coughing.

For the next several minutes, the officers hold the cell door flap closed. Defendant Von Mutius then faces the camera and says that if the inmates refuse to follow the next set of directives, the next step is to use a thirty-seven millimeter inside the cell. Von Mutius tells the inmates to get face down on the cell floor. A few seconds later, the officers open the door flap and remove the materials that were preventing the flap from closing. A group of officers surround the cell door. One of the inmates continuously yells profanities at the officers. The officers order Wright to step out of the cell first. Wright steps out, followed by Arnold.

The inmates are led away from the cell and to a separate room. Coughing can be heard, but it is unclear who is coughing. Grant then states that the inmates will be placed on control cell. He directs one of the officers to put a mask on and go take everything out of the cell. (ECF No. 62-12); Exhibit K- Video 1.

The second video is twenty-one minutes and two seconds long and depicts the following. A registered nurse, referred to as RN Rockowitz, appears on the screen and states that he has checked both inmates. There is no video recording of the actual assessment. The nurse states that both are showing signs of what sounds like "chemical suffering" including running nose, watering eyes, and coughing. However, he states that neither inmate is under respiratory distress so they are "good to go."

Wright again argues that he has been unable to get his legal work. Grant states that he has to follow the proper procedure. At four minutes into the video, the inmates are led to a separate

room, where they are strip searched. Arnold is searched first, and after he is searched, he is allowed to get re-dressed in his same clothing.

Wright is searched next. When the officers allow Wright to get re-dressed, he throws the jumpsuit on the floor and says it has "all that gas" on it. The officers then give Wright a new jumpsuit to wear.

The officers then walk the inmates back to their cell. When the officers approach the cell, there is white material all over the floor in front of the cell that looks similar to what they pulled out of the flap initially. As they approach the cell, a few of the officers cough. While the officers are standing with the inmates in the hall, there are various sounds in the background that sound like the cell might be being cleaned. Even after this, officers continue to cough. When the inmates are led into the cell, a large, circular orange-brown stain (like what one might expect from a spray of gas) can be seen on the wall near the door.

Once the inmates are placed back in the cell and uncuffed, the officers secure the door flap. Defendant Von Mutius faces the screen and introduces the individuals that helped lock the inmates up. He states that Officer Rockefeller was the shield person and that Officer Johnson was the camera person. He identified one other officer as helping with the use of force, but the name is unintelligible. (ECF No. 62-12); Exhibit L-Video 2.

## II. Legal Standard

Summary judgment is appropriate if, after reviewing the entire record in a case, the court is satisfied that no genuine issues of material fact exist and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). An issue of fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the plaintiff. *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986). Issues of fact are "material" only if establishment of such facts might affect the outcome of the lawsuit under the governing substantive law. *Id.*

### III. Discussion

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. It not only prohibits excessive sentences but also protects inmates from inhumane treatment and conditions while imprisoned. Determination of whether the Eighth Amendment has been violated requires analysis of subjective and objective components. *See Wilson v. Seiter*, 501 U.S. 294, 302 (1991). Specifically, when alleging an Eighth Amendment claim for excessive force, the prisoner must prove the official possessed a culpable state of mind (subjective component) and caused the prisoner a sufficiently serious deprivation or injury (objective component). *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). What must be established with regard to each component "varies according to the nature of the alleged constitutional violation." *Hudson v. McMillian*, 503 U.S. 1, 5 (1992).

In regards to an excessive force claim, to establish the subjective component, an inmate must show that the prison official acted "maliciously and sadistically for the very purpose of causing harm," rather than in a good-faith effort to maintain or restore discipline. *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986). In making this determination, courts should consider: (1) the need for application of force; (2) the relationship between the need and the amount of force used; (3) the extent of the injury inflicted; and (4) the extent of the threat to the safety of staff and inmates as reasonably perceived by the responsible officials on the basis of the facts known to them. *Id.* at 321.

The objective component measures the force used against "contemporary standards of decency." *Hudson*, 503 U.S. at 8 (internal quotations omitted). The objective component is not

as demanding because "when prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated. . . ." *Id.* (internal quotation marks omitted).

While courts recognize that a limited application of chemical munitions may be a "much more humane and effective" response than "a flesh to flesh confrontation with an inmate," it is also "generally recognized that 'it is a violation of the Eighth Amendment for prison officials to use mace, tear gas or other chemical agents in quantities greater than necessary or for the sole purpose of infliction of pain,' " the Fourth Circuit "has closely scrutinized the use of tear gas or mace . . . in correctional facilities." *Williams*, 77 F.3d at 763 (quoting *Soto v. Dickey*, 744 F.2d 1260 at 1262, 1270 (7th Cir. 2009)); *see also Iko v. Shreve*, 535 F.3d 225, 239-40 (4th Cir. 2008) (finding use of pepper spray during cell extraction of nonconfrontational inmate constituted excessive force). In doing so, courts recognize that "even when properly used, such weapons 'possess inherently dangerous characteristics capable of causing serious and perhaps irreparable injury to the victim.'" *Williams*, 77 F.3d at 763 (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir.1984)). Thus, "although it is not per se unconstitutional for guards to spray mace at prisoners confined in their cells, it is necessary to examine the 'totality of the circumstances, including the provocation, the amount of gas used, and the purposes for which the gas is used [to] determin[e] the validity of the use of tear gas in the prison environment.'" *Id.* (quoting *Bailey v. Turner*, 736 F.2d 963, 969 (4th Cir.1984)).

Moreover, "even where an initial use of force does not by itself raise questions about a corrections officer's intent under *Whitley*, the continued application of force may give rise to an inference that force was used for malicious or punitive purposes." *Brooks v. Johnson*, ___ F.3d ___, 2019 WL 2063365, at *6 (4th Cir. May 10, 2019) (citing *Iko*, 535 F.3d at 239–40, 240 n.11)

(holding that although initial use of pepper spray to carry out cell extraction appeared warranted, four additional bursts of pepper spray - including one when inmate was lying on floor - gave rise to reasonable inference that force was applied maliciously).

In this case, Defendants assert, and the magistrate judge agrees, that Wright has not created a genuine issue of material fact concerning whether Defendants acted maliciously and sadistically, rather than in a good-faith effort to maintain or restore discipline. Accordingly, Defendants contend that Wright has failed to meet the subjective component in *Whitley*. The court, respectfully, disagrees.

When viewing the facts in the light most favorable to Wright, as the court must on this motion for summary judgment, there exist genuine issues of material fact as to whether Defendants acted "maliciously and sadistically for the very purpose of causing harm." *Whitley*, 475 U.S. 320 – 21. While the court did view the two videos, the videos did not start until after the first round of chemical munitions had already been sprayed. The events leading up to the first spraying are highly contested, and, accordingly, a genuine issue of material fact exists as to whether the first spray of chemical munitions was made in good faith. For instance, in response to the summary judgment motion and objections to the Report, Wright specifically asserts that the use of force was without provocation or need, that Defendants were not making a good-faith effort to maintain or restore discipline, and that Defendants acted maliciously and sadistically. (ECF Nos. 67 at 6 – 12; 73 at 4, 5). In fact, Wright states that he was sprayed as a form of "punishment." (ECF No. 67 at 7). In support, Wright attaches his own affidavit and those of two fellow inmates who attest to witnessing the incident. (ECF Nos. 67-3; 67-4; 67-5). All three statements depict a malicious and unprovoked attack. The credibility of these statements is an issue best suited for a jury. *See United States v. Beidler*, 110 F.3d 1064, 1067 (4th Cir. 1997)

(stating that credibility determinations are for the trier of fact, not the reviewing court). While Defendants give an entirely different account of what led to the initial spraying of gas, because the video did not start until after the first spray, for the purposes of the motion for summary judgment, the court must give weight to Wright's version.

Additionally, while the later portions of the encounter were captured on the video, the video is often not obviously contradictory of many of Wright's purported facts because it fails to provide an unobstructed view of the events. So, the court has credited Wright's version of the record evidence where no obviously contradictory video evidence is available, as he is the non-moving party. While the video provides some reason to doubt the veracity of some aspects of Wright's account, it is not so "blatantly contradict[ory]" that the court may entirely disregard Wright's version of events for purposes of summary judgment. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). Where the video obviously contradicts Wright's version of the facts, the court accepts the videos depiction instead of Wright's account. *See id.* (stating that when a party's version of the facts is "blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a summary judgment motion").

For instance, while Defendants claim that Wright was actively resisting prior to Von Mutius spraying the second round of chemical munitions, the video fails to provide an unobstructed view of what was happening within Wright's cell. Wright claims that he was still hiding within his mattress at the time of this part of the encounter. (ECF Nos. 1 at 5; 67 at 2). While Wright's voice can be heard speaking from the other side of the cell in the video, there is no visual depiction of him actively resisting the officers nor does the video provide any clear proof that he was not inside his mattress as he claims. Accordingly, taking the facts in the light

most favorable to Wright where the video does not clearly contest his purported facts, the court finds that a genuine dispute of material fact exists as to whether Wright was resisting the officers at the time of the spraying of the MK-9 chemical munitions.

Accordingly, in considering the *Whitley* factors, taking the facts in the light most favorable to Wright, the court recognizes that a reasonable jury could conclude that the factors weigh in Wright's favor. If the initial spraying was unprovoked, as Wright claims, then there was no need for the application of force and no threat of safety to staff or other inmates that would warrant the application or amount of the force used. As to the second spraying, if Wright was not actively participating in the effort to barricade the door and was in fact hiding within his mattress, a reasonable jury could conclude that the second spraying was, likewise, unwarranted or excessive.

Furthermore, while a "prompt washing" of an area affected by chemical munitions "will usually provide immediate relief from pain," *Hinojos v. Bowers*, No. 2:14-cv-01800-DCN, 2015 WL 4878812, at *5 (D.S.C. Aug. 14, 2015) (citing *Williams*, 77 F.3d at 763), a claimant may maintain an Eighth Amendment claim of excessive force where he is subjected to chemical munitions and not allowed to wash or decontaminate himself. *Mann v. Failey*, 578 Fed. App'x 267, at * 5-6 (4th Cir. 2014); *see also Williams,* 77 F.3d at 768. "Courts have found that the question of whether a prisoner was sufficiently decontaminated following the use of pepper spray or mace is a significant factor in upholding the use of mace." *Mann v. Scott*, No. 0:14–3474–RMG, 2015 WL 5165198, at *5 (D.S.C. Sept. 1, 2015) (citations omitted). In *Mann v. Failey*, the Fourth Circuit held that summary judgment was precluded when the record demonstrated that officers refused to allow a prisoner who had been maced to decontaminate. *See Failey*, 578 Fed. App'x at 269-71. The court holds there exists a genuine issue of fact as to

12

whether Plaintiff was denied access to running water. Furthermore, it is uncontested that Wright was not allowed to shower following the incident. Therefore, the court finds summary judgment to be improper.

Accordingly, based on the differing accounts of the facts leading up to Defendant's use of force and afterwards whether Defendants denied Wright the opportunity to clean off the chemical munitions, the court is unable to grant Defendants summary judgment. *See Hinojos v. Bowers*, No. 2:14-cv-1800-DCN, 2015 WL 4878812, * 8 (D.S.C. Aug. 14, 2015) (citations omitted) ("[T]he court holds that there is a genuine issue of material fact as to whether [the defendant] used excessive force against [plaintiff]; therefore, the court cannot determine at the summary judgment phase that [the defendant's] actions were objectively reasonable for purposes of granting qualified immunity.")

Furthermore, the court notes that Wright has specifically pled multiple factual allegations against Defendant McFadden. (ECF No. 1 at 3–5). Additionally, it appears that Wright also seeks to hold Defendant McFadden responsible under the theory of supervisory liability for the actions of the other Defendants. Based on the vast differences in the factual accounts of Wright and Defendants, which could affect the court's analysis as to the claims against Defendant McFadden, the court finds that it is not appropriate to dismiss those claims at this time.

Finally, the court disagrees with the Report's analysis of qualified immunity in this case, and instead finds that, in light of the significant variations in the parties' factual accounts, it cannot make a finding as to qualified immunity. *See Hinojos*, 2015 WL 4878812, at *8 (stating that because genuine disputes of material fact precluded summary judgment, the court could not determine at the summary judgment phase that the officer's actions were objectively reasonable for purposes of granting qualified immunity).

## IV. Conclusion

Accordingly, the court, respectfully, declines to adopt the Report (ECF No. 70). For the reasons stated herein, the motion for summary judgment (ECF No. 62) is **DENIED.**

**IT IS SO ORDERED.**

s/Timothy M. Cain
Timothy M. Cain
United States District Court Judge

June 19, 2019
Anderson, South Carolina

## **NOTICE OF RIGHT TO APPEAL**

The parties are hereby notified of the right to appeal this order pursuant to Rules 3 and 4 of the Federal Rules of Appellate Procedure, if applicable.